Incorporated against Universal Support Systems, LLC, Mr. Dawson. Good morning and may it please the Court, my name is Edward Dawson and I represent the when estimating the value of USS's claim in EMI's bankruptcy. The 163 patent claims a foot with a gap between receptacle and base that reduces the foot's susceptibility to movement by allowing the passage of air, wind, or water. The District Court erroneously accepted without analysis or explanation USS's interpretation of the patent, which is that any space between receptacle and base would render a foot infringing. That interpretation is inconsistent with the plain language of the claim, which requires that the gap reduces susceptibility to movement caused by force exerted by wind, air, or water. None of the evidence at the claim estimation hearing showed that EMI's allegedly infringing feet had that element of claim one. Instead, USS put forward and the District Court accepted an interpretation that any gap would infringe because of weight distribution properties that would reduce susceptibility to movement, but that's not what the claim language requires. Moreover, the attempt to claim a foot with a gap alone was rejected before USS got its patent and the patent was only issued when the susceptibility to movement language was added. USS must be held to the limitations of the patent that it got and not the one that it wanted. Because the District Court misconstrued the patent, it abused its discretion in finding that EMI's feet infringed and in estimating USS's claim based on that finding. Mr. Dawson, there are so many issues in this case that I don't really know where to begin and I don't want to take up the time of my colleagues, but let me just begin with my first issue, which is you all seem to be disputing whether the holes, the gap, the spacing of the receptacle above said base is subject to just air, wind, or water, or whether it's subject to any kind of forces. That seems to be what the argument is. I don't see anything in the trial court's explanation that even explains to me whether the trial court thought the phrase to decrease susceptibility to movement of said apparatus was a functional requirement or simply a descriptive one. That is to say, does there have to be more than a gap in order to meet the... What is the meaning of that element of the claim? Is it a functional element or is it simply the requirement that there be a space and to decrease susceptibility is sort of descriptive but not an inherently required function because there's almost no evidence as to how big a hole you have to have to achieve that function. That's right. What are we to do with all of that? That's a terrible mess. To begin with, the district court failed to engage that issue of claim construction, which constituting an abuse of discretion. You can't say he failed to engage it. He said that it's clear on its face and should be given its ordinary and plain meaning. He didn't completely fail to engage it. Correct, but the district court said that there was no dispute over claim construction when, in fact, there is a dispute. To answer your question, Judge Plager, the limitation is a functional limitation. It was added in the prosecution process to say that the gap has to allow the passage through of wind air and water in order to reduce the susceptibility of movement. If you look at the... Counsel, isn't it possibly a question of infringement and not claim construction because even a pinhole in a sale would have an effect, right? Even a pinhole. I know you want a gap. You want a very large gap so as to exclude as many of your infringing products as possible. Certainly, the larger the gap, probably the more help it would be, but why would even a pinhole be sufficient? Because that's what their expert says, basically. He says any gap would suffice, and he also says any gap would make it less susceptible to movement. First of all, the vast majority of the expert's analysis was not related to that construction. That's EMI's construction of the patent that there has to be a functional reduction in the force exerted. Second, in one sentence he said that there would obviously be a tendency to reduce the force exerted if you had some sort of a hole. He analogized to a hole in a sail on a ship. He had seen a History Channel documentary and mentioned it. Why isn't that simply facially accurate? It seems right to me, but a hole in it also seems like a matter of infringement, not claim construction. Look, the construction issue is whether or not that gap reducing susceptibility to movement is in fact a functional requirement that the allegedly infringement device has to meet in order to infringe. But their expert says even if it is, even a pinhole will do it. He also said that he made no attempt to quantify that force or to demonstrate that there was a reduction in susceptibility to movement. He just said anybody would know a hole in a sail will reduce susceptibility to movement,  but obviously if that's all that's required to demonstrate infringement, it shows why the patent is in fact obvious. But that's exactly why it wouldn't be a matter of claim construction. Why it would be a matter of the infringement analysis, because how big the gap has to be is going to be related to the load that's going to sit on it, so as to whether or not it presses it flat and retains the gap. It's going to be related to the amount of, basically the size and construction of the device. I can certainly understand why they wouldn't want to put in here a gap of one quarter of an inch, right? Because that would be really easy to design around. They did not put in a specification as to the size of the gap, but the point here is that there's no guidance as to how large the reduction in susceptibility to movement must be in order for the device to infringe. So there's no way to tell whether the device infringes or not. Right, because any reduction in the susceptibility to movement would fall under the claim. But if what is claimed is a microscopic reduction in susceptibility to movement by a microscopic gap, then the patent is obvious because anybody would know, as Aiken himself, Aiken is the expert for USS, as he testified, anybody could tell you that if you have a hole in the foot as if you have a hole in the sail, there would be a reduction in the susceptibility to movement. Well, anyone could tell you that if you have a hole, it would reduce susceptibility to movement. And not everybody would have put it together with this particular invention with all the other limitations, which is, I think, their argument as to why it's not obvious. But the point is that the language of the patent written into the claim says you have to have a reduction in susceptibility of movement due to the passage through of wind, air, and water. Do you mind if I move you on to a different point? I do not understand a lot of this bankruptcy stuff. I'm just going to lay it out on the table. What in the world really happens? Is the suit gone now? It stayed. But does it ever take place? This is called an estimation. Well, that led me to initially think that meant it's just a sort of first blush at what the patent suit is worth. And then maybe a full-blown thing would occur over in the other district court. But my research has suggested that full-blown thing is never going to happen, that this estimation represents the end of this entire dispute between the parties. Is that right? That is correct. Because the claim is estimated and then that estimated value was put into the bankruptcy plan, which was then confirmed, the claim is discharged and there's no means to litigate it further after the plan is confirmed. The last I understood was that other case was stayed. Is it dismissed now or will it be dismissed? It will be dismissed. But the claim is discharged and there's no opportunity to litigate it further, which is why it's a final determination and also because of the underlying patent issue. All there is here is a patent claim. And that's why this court has jurisdiction. Assuming we affirm it, the claim will be dismissed in the trial. But if we don't affirm this, then it will go back to the district court. The plan allows for the distributions to be modified based on this court's decision. Let me pick up on that colloquy for just a moment. You're in bankruptcy, aren't you? Yeah. EMI is bankrupt. The plan has been confirmed, but EMI is making distributions under its bankruptcy plan. Who's been discharged? Yeah. And who is representing EMI? Are you the trustee? Are you representing the trustee in bankruptcy or EMI has been discharged from the bankruptcy court? That's correct. EMI is a going concern after confirmation of the bankruptcy plan and it's paying distributions under its plan. So we represent EMI, the reorganized EMI, which has emerged from bankruptcy. And what will be the consequences if we decide that there was an error, hypothetically, if we decide that we are not going to affirm what the bankruptcy court did with regard to the patent dispute? What's the consequences of that? It will go back to the bankruptcy court and the plan, the distributions that are to be paid under the plan, will be modified according to the judgment that is issued in line with the court's reversal of the district court's opinion. I would like to say something quickly about the willfulness and attorney's fees issue. Can I actually ask you? I have a question right on that topic, so I'm thrilled that you're moving to it. The attorney's fees, so this is one of the strangest things I've ever seen in terms of the district court judge deciding he was going to enhance attorney's fees. I certainly understand the concept of enhancement for willful infringement, but the enhancement for attorney's fees struck me as very strange. So what do you think we ought to do with that? Sure. First, as to willfulness, there was not willfulness here. Go to attorney's fees. With the willfulness falls, the attorney's fees have to be revisited. In addition, the- Even if willfulness doesn't fall, isn't it odd that the trial judge enhanced attorney's fees? The attorney's fees, they said, here's how much we spent. The trial judge said, that's not enough. That's right. How can this be done? It was wildly excessive and out of proportion. One of my favorite things was that they presented evidence liking it to a full-blown patent trial, which this clearly was not. It seems to be a very bizarre procedural way of resolving this case. The judge says, oh, well, if this is how much you might have spent in a full-blown patent trial, let me give you that much instead. It was a truncated proceeding. The fees were out of proportion. In addition- It was a contingent fee basis. It could have been that the attorney would have earned nothing. And my understanding is that the bankruptcy judge has significant discretion in determining the fair value of legal services that have been rendered. The abuse of discretion standard applies to the claim estimation, but there were clear errors in the amount of fees that were awarded here, the discrepancy between the contingent fee amount and the hourly amount, the inclusion of costs for expert witness fees, which this court says cannot be included in a 285 fee award. Well, that's not correct, counsel. We don't say they can't be included. We have cases on this point, Amstead and Takeda, that both say they can. It's just in the rare and unusual circumstance of something amounting to fraud on the court. And there was nothing like that here, and also the district court did not engage in that issue. No, we don't know if there was nothing like that here because he did cite a lot of what he perceived to be mischievous and possibly devious behavior during litigation and hiding the ball, and he was very troubled by the behavior of EMI during litigation, and he cited all of that in his very brief analysis. So, I mean, wouldn't the more appropriate thing for us to do, if we were going to find trouble with this attorney fee award, to at least kick it back and let him reconsider whether expert fees ought to be awarded because we can't make a fact finding in the first instance here whether your behavior was bad enough to amount to fraud. The district court gave no basis to justify that award of costs in with the fees award. Well, he didn't consider it at all. He just thought he could lump them in, so he didn't consider whether it met the standard articulated in Takeda. Correct. I'd like to reserve the remainder of my time for rebuttal. Okay, thank you. We'll save you enough rebuttal time, Mr. Dawson. Mr. Nickens? Do you mind if I start you where we're leaving off? Yes. Should I give my name before we start? My name is J.C. Nickens. I represent Universal Support Systems, appellee and appellate on certain cross-claims. I was the lead trial lawyer in the case below, and I believe I can and will address your issue about attorney's fees. And it goes to part of the overall issue about this case. The EMI below claimed that our contingent fee could not be a basis for award of attorney's fees. That is in their pre-hearing brief. And as a result, we presented evidence about a Lodestar recovery and compared it to other cases, primarily arising out of the Eastern District, but also the Southern District, for the award of Lodestar kind of recovery in contingent fee arrangements. Yes, but the cases you compared it to out of the AIPLA survey are for full-blown patent cases from complaint through JMAL, and this was certainly nothing that resembled that. It was not. But we had about $500,000 of time in the case. We had $200,000 of expenses that we had advanced. Expert witnesses. And they were primarily lawyers, the expert witnesses, but primarily lawyers in the case. But your testimony is those were expert fees. These are not lawyers. Yes, I'm just pointing out that those experts were Mr. Gordon and a bankruptcy lawyer in the case. I mean, they were lawyers, and the bankruptcy lawyer was not a witness in the case. It was what we had to pay. So that was the basis for the recovery. It was a Lodestar analysis. We did present evidence. I have no problem with your Lodestar analysis, but it got to $500,000 plus $200,000 for the expert fees. And then the district court, by the way, didn't adopt Lodestar, but rather cited Johnson v. Georgia Highway, which the Supreme Court looked at quite quizzically in one of their cases. Instead of sort of following a pure Lodestar-type approach, as you're suggesting, looked at Johnson and then suddenly decided he was going to, quote, enhance fees. So you never even asked for a million dollars. I mean, you must have felt like you won the lottery that day. Well, not exactly, because she also cut way back on our actual damages. I bet you had a party, didn't you? Well, Your Honor, we don't recover the attorney's fees. We recover from our client what the basis of our contract with them. So this money goes to the client, and we get whatever our contract provides. So you get 35% of $1.4 million, which ends up being right around your $500,000. Right, payable out over five years. We're receiving payments from them through this bankruptcy over about the last year and a half. I would like to – Your Honor, I'm not planning to go over the 170 pages of written briefs that you have in this case. There are lots of issues. I have four basic points that I would like to make that I hope will enhance, if you will, or illuminate our arguments on the – Four points. Four points. Lots of luck. Go ahead. I may not get there, but let me say the first one. This case comes to you, Your Honor, in what I regard as – what I would describe as a highly unusual and sort of awkward procedural posture. Awkward because the hearing below was not a patent trial, even though it has all kinds of trappings. We lost that battle to EMI. We wanted a patent trial. The judge, in the context of this bankruptcy proceeding, in which she was being told – You wanted to remove the referral and you couldn't get it done. We did get the referral removed. In other words, we got a hearing on the bankruptcy matter in the district court rather than the bankruptcy court. The bankruptcy court had said to EMI, you have to admit liability for it to stay here and I will determine damages. They wouldn't admit liability. He felt like it should go to Judge Gilmore, the district judge, an Article III judge. Then she gave us – They argued give each side two hours for this patent hearing, the patent trial. She gave us a bit more than that, but it was all in the context of a 502c1, which I will point out is not an adversary hearing before the bankruptcy court. Her discretion is very wide. Your review, if you should review this case, is very limited to an abuse of discretion standard under the bankruptcy rules on all points. Let me just stop you there for the moment because I'm puzzled about this. I don't know about Judge Newman, but in the years I've been on this court, I think this is the first bankruptcy case I've seen. No, there have been a few. There have been a few, but I don't think I've seen one. I don't think I've seen one, so I need a little help. Do we look at this patent resolution? Do we ask questions like, was it clear and convincing? Do we ask questions like a ponderance of the evidence? What is it you understand we should be expecting the trial judge to have done in this patent litigation, or do we simply say, well, this was really a bankruptcy dispute and we don't apply the usual patent law standards to it? What is your understanding of that? Your Honor, you can't apply the patent law standards to it because we didn't get a patent trial. We got a bankruptcy proceeding where all the evidence comes in. We got very limited discovery. There was no claim resolution. We didn't have a Markman hearing, at least a separate Markman hearing, and the judge said she collapsed it into. And frankly, if you look at this record, and I particularly ask you to look at the pre-hearing brief filed by EMI, there is no claim construction. All of this appeal has been about claim construction. There is no claim construction dispute raised by EMI below, and now they're criticizing the district court judge for conducting this hearing in the bankruptcy and not having appropriate claim construction findings when they said, she found there wasn't a dispute. You mind if I ask you a question about infringement and move off of claim construction? I will, yes. Okay. Could I ask you to open your blue brief to page 22 or in the back, which is the district court's, you see this is the district court's chart. Yes. So it's in the appendix, page 22, this is how the district court came up with the award of royalties. Yes. Do you see it? Yes. Okay. So what I'd like to ask you is the infringing feet listed as E and G, those infringing feet, they actually filled the gap with silicone, so they were never sold to the gap. That's not quite right, Your Honor. Explain it. Well, it was never clear. There was a factual dispute as to whether they had sold them or not. Yeah, no, but the ones over which there was a factual dispute, she lumped those all into D. E and G were the ones that it was clear were never sold with silicone. If I'm wrong, please point me to a portion of her opinion that says otherwise, because I thought it was pretty clear. Okay, the basis for it. There was a dispute over some and she gave you the benefit of the doubt on all of those and lumped them into D. Well, except that she took their representation, even though there was a factual dispute, Mr. Egan had said that they started filling them with silicone, but they also sent his children out in the field to fill in silicone. We could never find it and we disputed whether that was true. Those were also not the ones put under E and G. She left all of those at A, B, C, and D. Those were not under E and G. E and G represents, okay, just assume. I'll go back and I'll search the record more carefully. Assume that my reading is correct, that E and G are the ones that were filled with silicone and never left the factory with the gap in them ever. No person ever held them in their hands, used them, or sold them with the gap in them. Why ought those to be entitled to an 11% reasonable royalty? Well, they were sold. Not with the gap in them, so they didn't, no infringement was made once you filled that gap in them. The issue was that they were made and manufactured. The apparatus had all of the elements of the patent and then they claimed to have filled them in. Okay, counsel, so here's my problem. This is sort of a patent law thing I was worrying myself over last night. Suppose you have a patent on a bicycle. Okay. You've got a patent on a bicycle. I am going to make a tricycle. In the minute before I put the third wheel on, have I infringed your patent? If you have advertised it for sale as a bicycle and held it out to sale and you are trying to design around it and sold it, then I would say yes. Now, I will also say that you undoubtedly are far more expert than I am. The reason we had a bankruptcy lawyer was because I'm a trial lawyer and I don't profess to have patent expertise of the nature that you're talking about. So I'm giving you my response, but with that. Well, I think what the judge is trying to ask you is in the course of manufacturing a product, at what point is it, quote, made for purposes of the patent law? And it seems to me it's not made until it is a completed product and put on the market. If the caulking took place, she hypothesizes, before it was put out as a finished product, then there wasn't any gap. We can't tell, at least I can't tell for sure from the record, perhaps Judge Moore will enlighten us later. When the caulking took place, does that matter? Well, it didn't matter to Professor Aiken. It could matter under certain theories because his theory was that the gap was there with the distribution of weight and that it had to actually close under load in order to not be infringing and that the caulk would not prevent that. But I fully acknowledge that I think there is a significant issue there on the facts of this case and with the very limited discovery that we had, we don't know how many of those went out and how many were filled in the field and whatever. Our case was that they had made it and that they're going back later. They had advertised it going back later. That was the issue. Now, for the legs where the silicone caulking was applied after they had been sold and were out in the field and the court concluded that those were infringing, those were included in the 11%, is that right? Yes, they were. I believe they were. What she excluded were two versions that had been welded. One of them welded all the way around. Well, those were held not to infringe. And those were held not to infringe. F and H. Those are the ones that were excluded. Everything else was included in the calculation of the 11% welding. Okay. We got through your first point? Not quite. I'll tell you what I'm going to do. The point number two is that they really have recast their arguments for this appellate that were never brought up below. And again, I would refer you to the pre-hearing brief where they say what the issues were. They offered no definitions. They basically invite you. One could perceive that they invited these errors that they now complain about. I would like to get to this point. They misrepresent the central issue in the case and the claim language. It is the susceptibility to movement of said apparatus. It is very clear that the said apparatus is an individual foot. It's not the platform as applied in the case. Yeah, but it's equally clear that the forces are only limited to water, air, and what was the other one? Those could go through. Those would be the things that would decrease. And those were the only forces that were explained in that element in the patent. So the notion that other forces are involved seems to me to be way off. It certainly didn't come up in the context of this proceeding. The foot had, and this is that brochure, it had an area of 201 square inches. It weighed 22 pounds. You fully loaded the forces on a roof. The reason for this was that, remember, they didn't want to attach this apparatus to the roof because it would compromise the membrane of the roof. And all of this in the record. Modern roofs are actually quite fragile in terms of that. And so they reduced the weight on fully loaded to 2 pounds per square inch. Unloaded, the apparatus had a force on the roof of 1.75 ounces per square inch. This is not a child pushing across the Great Wall of China, as described in this briefing. A child could, in fact, push this. And a 3.16 inch gap, which is what theirs was, after representing that it was 1.16, and producing what appeared to be a forged drawing showing 1.16 that we went to trial on, would reduce the forces of a half inch of water on that roof by just basically one half. This was a functional limitation as well as a descriptive limitation. What was the evidence that you put in? There's very little evidence. What was the evidence about exactly how much water, how much air, how big a hole? How can you—tell me, how did you prove your case that they— Well, because they— —had those that prevented movement? Where is the evidence? They didn't raise this as a claim. Well, I'm raising it because you need to show by a preponderance of the evidence that there was infringement. Well, I just cited evidence in the record. Admittedly, this is not perfect because this was an issue that was not on the horizon. They just didn't raise it in that manner. They didn't present any evidence. We put on our expert. They cross-examined him. There wasn't anything there. I will also point out in the minute left that there was no degree limitation on the patent. It didn't—it just said it reduced it. This is the point that Judge Moore was making earlier. My fourth point was that EMI has been—am I over? You are, but do complete this question. It was and has been gaming the system. They raised issues that weren't raised below. There was all kinds of false testimony. There was a false sales data. There was false testimony about when the silicone was applied. There was the false date of sale. There's this silly reference to the advice of counsel when the record showed that he only had seven hours that he had been consulted in this case. You know, it's—I will finish. It's very difficult having tried the case and then come and argue a completely different case that was not raised below, and we just suggest that it should be affirmed that it should be on my behalf. Thank you, Mr. Mathens. Mr. Dawson. Yes, I'd like to start by addressing the point that the claim construction issue wasn't raised below, that this is a different case. But what about this point? And it does seem to be well supported. Before the bankruptcy judge, the court was concerned about establishing the parameters of the bankruptcy claim. And in two hours, it's not easy to put on a full-blown either attack or defense of the virtues and the scope of patents. And yet you are—you've complained that there was no Markman hearing. And all of the other issues that we ordinarily see, that's true. But we need to keep this in the context of the bankruptcy proceedings. Certainly. We're not complaining that there wasn't a Markman hearing. We're not complaining about the procedures that were followed. What we're complaining is that the district court judge got the law wrong in construing the patent, in finding willfulness, in finding attorney's fees. And under the bankruptcy claim estimation procedure, the judge is required to apply and get right the substantive law that governs the value of the claim. As we explained in our briefing, there were a number of errors. And the fact that we requested a claim estimation procedure does not mean that there is a license to get the patent law wrong. Well, Mr. Dawson, shouldn't we treat this a little bit like we used to treat jury trials? That is, it comes up here in this peculiar context almost as a black box judgment. And what our job is, perhaps, is to see if there's anything in the record that would provide support for the judge's decision, rather than spend a lot of time trying to figure out, did the judge explain what her claim construction could have been? Because she said, I'm just going to apply this language as it appears. Rather than go through an exercise of critiquing her opinion, shouldn't we just sort of look at this and say, is there substantial evidence in the record to support her outcome? Would that be a fair way for us to look at it? No, because the substantive law that governs the value of the claim is patent law here. And the district court undertook to perform a patent law analysis and to analyze willfulness, analyze attorney's fees, and made errors on all of those fronts. And the panel, this court, is to look at that under an abusive discretion standard, admittedly, but it is not just to eyeball the result and see if it seems like it's in the ballpark. Which, by the way, it's not when you have a $1.4 million award on what is an underlying, at best, $200,000 worth of damages. Very quickly, I would like to say that we did raise the claim construction point, point the court toward pages 723 and 724 of the appendix, page 1162 and 1165 through 66, all of which show where we raised the claim construction points that we are raising in this court now. Thank you. Thank you, Mr. Dawson. Mr. Nickens, the case is taken under submission.